## WILSON, Adm'r, v. EDMONDS.

The decisions of a court of probate, of matters within its jurisdiction, regularly made, are conclusive, unless an appeal be taken. But as to matters connected with the settlement of an estate which might be investigated by the court, but are not, the decision can have no binding effect.

A tenant for life is bound to use ordinary care in keeping the buildings in which he has a life estate, from going to decay; but in doing this he is not obliged to expend extraordinary sums.

A mere authority to make repairs upon premises terminates with the life of the landlord; and sums expended by a tenant, under such authority, subsequent to the death of the landlord, cannot be recovered against the estate.

Notes taken as running to "the estate" of a person deceased, may be proper matter of set-off, in the hands of the executor of the estate, against a claim for a legacy given to the maker of the notes, by the testator of the estate.

A promise made upon a past and executed consideration, is, in general, not binding; but where it is made to pay for labor performed or services rendered, which have been beneficial to the promissor, and there is nothing in the evidence negativing a prior request, a jury may, from the circumstances of the case, infer a request.

ASSUMPSIT. The writ was dated March 21, 1848, and contained two counts; one for use and occupation, and the other for money had and received.

The case was committed to an auditor, who allowed the plaintiff's claim to the amount of $819.08, and the defendant's set-off to the amount of $1180.91, leaving a balance of $361.83 due to the defendant. The auditor's report was submitted to the jury, and a copy of the same formed a part of the case sent up. So much of it as is necessary for a proper understanding of the case is as follows:

"Having examined the witnesses and evidence produced by the parties, and heard their arguments, I state the accounts between the parties as follows:

Joseph M. Edmonds to John O. Wilson, Administrator, Dr.
To use and occupation of house No. 8, Court street,
   from July 1847, to July 12, 1848,  . . . . $180.00
Nov. 1847. Amount received from net sale of half
   house No. 14, Court street, . . . . . . . . 594.50

Interest on $594.50 from sale to 13th February, 1849, 44.58

$819.08

And there is due to said Edmonds, in set-off, as follows :

For repairs and improvements made by Edmonds
 on the house No. 8, Court street, prior to Sep-
 tember, 1844, . . . . . . . . . . $239.59

For repairs made on the same house between Sep-
 tember, 1844, and August, 1846, the time of
 the decease of James Wilson, . . . . . . 28.88

And for repairs made upon the same house from the
 death of James Wilson, up to July 1, 1844, . .144.72

The expenses of insurance and premium assess-
 ments, . . . . . . . . . . . . . 11.25

Taxes for the year 1848, . . . . . . . . . . 11.34

Aqueduct to June 30, 1848, . . . . . . . . . 4.00

Amount paid to Mrs. Tuckerman and others, by
 said James Wilson's request, being amount re-
 ceived for one share Portsmouth Aqueduct,
 sold for . . . . . . . . . . . . . 225.00

Amount expended for support, burial, &c. of grand-
 mother, beyond amount received from her es-
 tate and the estate of Peter Wilson, agreeably
 to request of said James Wilson, which amount
 was to be allowed in house rent, . . . . . 147.06

Cash, as per note of September 26, 1844, for $200
 on demand and interest, . . . . . . . . 200.00

Interest thereon to 13th February, 1849, . . . . 52.56

Cash, May 12, 1846, as per note for $100, on de-
 mand and interest, . . . . . . . . . . 100.00

Interest thereon to 13th February, 1849, . . . . 16.51

$1180.91

819.08

Balance due Joseph M. Edmonds, . . . . . $361.83"

The items going to make up the several sums expended in repairing the house, and also the amount expended in support, burial, &c., of Mrs. Wilson, were detailed at length in the auditor's report, but are not necessary to be introduced here.

The auditor further reports, that in September, 1844, James Wilson had a conversation with Edmonds, the defendant, in relation to the estate of Peter Wilson, and the support of Peter's widow, the grandmother of James, and the dwelling-house No. 8, Court street, in which they then were, and the repairs that had been made and were to be made thereon, and also respecting the aqueduct share mentioned in the will of Peter, in which Hannah Tuckerman and others were interested ; that he examined the repairs and improvements that had been made, and expressed his satisfaction with the same, and told Edmonds that if he was unable to pay himself out of the estate of Peter Wilson, for said repairs and the support of said Peter's widow, he must take his pay out of the rent. He also requested Edmonds to continue to make such repairs and improvements as he deemed necessary, and to manage the property in the best manner, although he thought it probable most of it would have to be sold for the support of his grandmother ; but he wanted to have as much of the real estate saved as might be, and said that if he could ever have that house, No. 8, he should be satisfied ; if any repairs were needed, Edmonds was to make them, and take the cost of them out of the rents.   Edmonds named some things he should like to have done, and James was perfectly willing they should be done.   James was anxious about his grandmother, and wished Edmonds to take good care of her at all events.   If aqueduct shares should be sold, James wished the amount for which one share was sold to be divided between Mrs. Tuckerman and the others named in the will.

On the 26th of September, 1844, James being about to leave Portsmouth for the South, Edmonds advanced him $200, and took his note for that sum, payable to " the estate of Peter Wilson," or order, on demand, with interest, and afterwards he advanced him another sum of $100, and took his note for the same, payable to said estate on demand, with interest.

Edmonds occupied the house No. 8, Court street, and made such repairs and improvements thereon as he thought expedient and proper. The expense of those repairs and improvements are mentioned in the account stated, and are reasonably charged. The services charged and the money charged as expended, were performed and expended, as charged, in the repairs and improvement of the house No. 8, Court street; and the money charged as expended for the support and burial of Peter Wilson's widow (147.06) beyond the amount received from the estate of Peter Wilson, or the estate of his widow, was paid as charged.

The rent of the house occupied by and charged to Joseph M. Edmonds for one year was reasonably worth $180, and no more.

The house No. 14, Court street, sold for $1200. The expense of selling it was $11. Net amount received, $1189, of which the one half is $594.50.

According to the account as before stated, the balance due to Edmonds is $361.83, to be varied as the court may direct on the statement of facts proved.

In addition to the report of the auditor, and in further support of his set-off, the defendant introduced the deposition of a witness, who testified that in September, 1844, he heard a conversation between James Wilson, the plaintiff's intestate, and the defendant Edmonds, about the estate of Peter Wilson, and that they conversed about aqueduct shares belonging to the estate of said Peter; "that James Wilson desired the defendant (if it was necessary for the support of his grandmother) that those shares should be sold; that the money for which one of those shares should be sold should be given to Mrs. Tuckerman and her children, and charged to him."

It appeared on the trial that Betsy Wilson, the wife of Peter, died in July, 1846, and Edmonds was duly appointed executor of her last will and testament. James Wilson was a grandson of Peter and Betsy, and died in August, 1846. Peter Wilson made his will May 12, 1842; a codicil to the same March 13, 1843; and a second codicil April 4, 1843; and died in November, 1843. His will contained these provisions:

" I give and bequeath to my beloved wife, Betsy, the sum of five hundred dollars forever; and I also give and devise to my said wife my dwelling-house, out buildings and lands, situate in said Portsmouth, No. 14, Court street, corner of Chestnut street, now occupied by myself, for and during the term of her natural life; and at her decease I give and devise the same, one half to James Wilson, my grandson, he to pay one hundred dollars to each of his brothers, John Wilson and William Wilson; one quarter to Hannah Tuckerman, wife of John Tuckerman, of this town; and one quarter to Peter Wilson Lyndsey, son of Henry Lyndsey, my wife's nephew."

" I give and devise my dwelling-house and land, No. 8, Court street, which I purchased of the heirs of the late Capt. Wm. Appleton, deceased, and now occupied by Joseph M. Edmonds, to my wife, for and during the term of her natural life; and at her decease I give and bequeath the same to James Wilson, my grandson, before named, and to his children at his decease ; but if said James Wilson dies leaving no child, the income of said house to go to his widow during her widowhood, and then the house to go to said James' heirs."

"I give and devise my dwelling-house and land, No. 5, Chestnut street, which I purchased of Richard Jenness, called the Pike house, now occupied by Walter Hill, and which is subject to the incumbrance of widow Pike's right of dower, to my wife, for and during the term of her natural life ; and at her decease I give and bequeath the same to Hannah Tuckerman, the wife of John Tuckerman and her heirs."

" I give and bequeath the sum of fifty dollars to Joseph S. Ayers, and the sum of fifty dollars to Joseph M. Edmonds, for them to aid Mrs. Wilson, by advice and assistance, in her business, to be paid within twelve months from my decease."

" After Mrs. Wilson has taken out the sum of five hundred dollars, bequeathed to her as above stated, and paid my just debts and the above named legacies, she is to have the use of all my personal estate for her support; and if the income of my real estate and personal estate should be insufficient for her

comfortable support, she is at liberty to dispose of any part of the same for her support."

"If after Mrs. Wilson's decease the aqueduct shares remain unsold by her, then I give and bequeath one share unto my grandson, James Wilson, and the other share I wish to be sold and divided equally between Hannah Tuckerman, her three children, Lyndsey, Elizabeth and John Horatio Tuckerman, the said Mrs. Tuckerman's mother, Patty Lyndsey, and Benjamin Lyndsey, son of said Patty Lyndsey, being in all six parts. And whatever other personal property there may be remaining after the payment of my just debts, and also of Mrs. Wilson's, and the legacies to Joseph S. Ayers and Joseph M. Edmonds, I give and bequeath one third to James Wilson, one third to Hannah Tuckerman, and the remaining third to be divided equally between Patty Lyndsey, Benjamin Lyndsey and Henry Lyndsey."

"I also give and bequeath unto Joseph M. Edmonds one year's rent of the westerly part of the dwelling-house, No. 8, Court street, now occupied by him, to be allowed him after the decease of Mrs. Wilson."

"Lastly: I constitute and appoint my wife, Betsy Wilson, the executrix of this my last will and testament, and after her decease, my grandson, James Wilson, Joseph S. Ayers and Joseph M. Edmonds, executors."

The first codicil contained these provisions :

"The land I purchased of Samuel Hale during the last year, situated at Christian Shore, (so called,) adjoining land of Supply Ham and others, I wish sold, either at public or private sale, and the net proceeds paid over to my wife, towards her support."

"I give and bequeath to Mr. Joseph S. Ayers, or his heirs, one year's rent of the easterly part of the house No. 8, Court street, now leased to Joseph M. Edmonds."

"I give and bequeath to Nathaniel H. Carey, of New-York, formerly my son-in-law, one year's rent of the house now occupied by me, after the decease of my wife, which house I wish sold after Mr. Carey shall have received the rent as aforesaid, or an equivalent thereto, and the net proceeds divided as mentioned in my will."

" I wish it also understood that the Appleton house is not to come into possession of James Wilson until Mr. Joseph S. Ayers and Mr. Joseph M. Edmonds, or their heirs, shall have received one year's rent thereof, as stated in my will, or an equivalent thereto."

The second codicil was as follows :

" Should the land I purchased of Mr. Samuel Hale be unsold at the decease of Mrs. Wilson, I wish it sold and the proceeds thereof to be appropriated as follows, (that is, after my debts and Mrs. Wilson's debts are paid,) viz: Fifty dollars to be equally divided between Mr. Joseph S. Ayers and Mr. Joseph M. Edmonds ; and the balance to be added to my personal property and divided as stated in my will."

" I wish it understood that Mrs. Hannah Tuckerman is to receive the income of the Pike house during her natural life ; and at her decease said house is to go to her heirs ; and should said Hannah Tuckerman die before this house shall come into her possession, I wish it to go to all her children in equal proportions."

" The widow of James Wilson (should said James die leaving one,) is to have the whole income of the Appleton house while she is a widow, and if she should again be married she is to have during her natural life one third of the income."

This will and the codicils thereto were duly proved, and Betsy Wilson, the wife of Peter, appointed executrix of the same. In May, 1844, the property was appraised and the inventory duly returned to the probate court. The real estate was appraised at $3300 ; two shares in the Portsmouth Aqueduct Company $420 ; money on deposit in the Portsmouth Savings Bank, $400 ; and furniture $214.50, making the whole $4334.50.

Betsy Wilson died before she settled any account as executrix of the will of Peter ; and on the 16th of March, 1847, the defendant, Edmonds, was appointed executor, according to the provisions of the will ; Ayers, one of the executors, having declined acting, and James Wilson, the other, being then dead.

On the 21st of September, 1847, Edmonds settled the account

of Betsy as executrix. In this account the estate is credited with $212, received on note due the estate from Goodwin & Coues, and with $1034.50, the amount of personal property taken at the appraisal, being $1246.50 in all.

The estate is charged : First, for last sickness and funeral expenses, $207.32 ; second, payments to sundry creditors, $341.26 ; third, appraisers and advertising, $9.17 ; fourth, legacies, namely, Joseph S. Ayers, as per will, $50 ; Joseph M. Edmonds, $50 ; amount left to me, $500 ; and for commissions on $1246.50, at five per cent., $62.33, leaving a balance of $26.42 due the estate. The account was sworn to by Edmonds.

On the credit side of the account is the following merorandum made by Edmonds :

" N. B.—The sum of $250, received by Mrs. Wilson from sale of lot of land, directed by Mr. Wilson's will to be sold, and the proceeds paid over to Mrs. Wilson, toward her support, is not introduced into this account.

" The income of all the real and personal estate having been given by said will to Mrs. Wilson during her natural life, she paid all the taxes and incidental expenses which accrued after the death of Mr. Wilson, out of the receipts ; consequently no bills of that kind are charged by her to the estate."

On the 17th of March, 1847, Edmonds, as executor of the will of Peter Wilson, caused an inventory to be taken of Peter's estate, which was returned to the probate office September 21, 1847. This inventory was as follows : Dwelling-house and land, No. 14, Court street, Portsmouth, formerly occupied by said Wilson, $1200 ; one pew in the North Church, $50 ; cash on hand, $26.42 ; total, $1276.42. This inventory was sworn to by Edmonds.

On the 21st of March, 1848, the same having been postponed from the 9th of November, 1847—Edmonds settled under oath his account as executor of the will of Peter Wilson. In this account the estate is credited with the above amount of personal property, $76.42, and with the amount received from sale of dwelling-house, No. 14, Court street, less the expenses, $1189,

making the amount of the credits $1265.42. The estate is charged with several small items, amounting to $16.67; then to net proceeds of sale of house, divided as per will, viz: P. Wilson Lyndsey one fourth, $297.25; Hannah Tuckerman one fourth, $297.25; James Wilson one half, $594.50. Commissions on $1265.42 at five per cent., $59.75, which balanced the account. With this account were filed what purported to be receipts of the legatees. It was admitted, however, that Edmonds never paid the $594.50 to James Wilson, and the same has been found due the plaintiff by the auditor.

On the 22d of March, 1847, Edmonds, as executor of the last will of Betsy Wilson, caused an inventory to be taken of her estate, which was sworn to by him. This inventory consisted of personal property solely, and amounted to $364.34, one hundred and ninety-two dollars of which was cash on hand. Betsy made her will January 24, 1846.

On the 21st of March, 1848, Edmonds settled his account as executor of the last will and testament of Betsy. The estate was credited with the amount of the inventory taken at the appraisal, $364.34; and was charged with the last sickness and funeral expenses, $297.29; payments to creditors, $1.33; appraisers, advertising, &c., $9.92; two legacies named in the will, $40; and commissions at five per cent., $15.80, making the account balance. This account was also sworn to.

All of the statements herein set forth touching the proceedings in the probate court were proved by the records of that court, and were all excepted to by the defendant's counsel, as having been used before the auditor, and as inadmissible to vary or contradict his report.

The plaintiff's counsel took the following among other positions: That nothing could be allowed in offset for the repairs which were made prior to the death of Mrs. Wilson. She was tenant for life and bound to keep the premises in repair, and James could in no way be liable to make repairs; consequently, if he made any promise, it was without consideration and void. That having made oath to the several proceedings in the probate

court, and these proceedings and accounts going to show the illegality of the defendant's set-off, he is estopped to deny any thing which these records and proceedings show: That as to the repairs after the death of James Wilson, the plaintiff contended that they were made without authority; that if there was any authority, it died with him and could not be binding after his death. And moreover, that these were all additions to the house, and not repairs: That there was no authority for the insurance, and that the amount paid for aqueducts was for the defendant's own convenience, and without authority: That the notes made payable to the estate of Peter Wilson, and which are set forth in the auditor's report, are not the subject of set-off: That the $225 paid to Mrs. Tuckerman and others is contradicted by the probate records, and that there is nothing in the agreement proved which authorized the finding of the auditor.

A verdict was taken, by consent, for the defendant, for the balance found due him by the auditor, with interest upon the same, on which judgment was to be entered, or the verdict to be set aside and such judgment entered either for the plaintiff or defendant, as in the opinion of the court there should be, upon the whole case.

*Emery,* for the plaintiff. All the questions in this case arise upon the set-off of the defendant, and I propose to classify them as follows:

    I. The repairs, &c.

    II. The aqueduct shares.

    III. The excess paid for the support of Mrs. Wilson.

    IV. The promissory notes.

The items following under the three first classes cannot be allowed to the defendant, if the facts appearing from the probate records are to be taken as true. I contend that those records cannot be set aside by parol testimony; that Edmonds was a party to them, made them, swore to them, and is estopped from showing a different state of facts from what appears by the records. All those proceedings took place after the time of the alleged contract between him and the plaintiff's intestate.

The proceedings in the probate court are of the same character as judgments. Judgments of courts of record are conclusive upon the subject matter embraced therein. A copy of the record thereof imports such absolute verity that it can be denied only by a denial of the existence of the record. *Tilton* v. *Gordon*, 1 N. H. Rep. 33; *Thurber* v. *Blackbourne*, 1 N. H. Rep. 242; *Bryant* v. *Allen*, 6 N. H. Rep. 116, and the cases therein cited, and *Goodale* v. *Marshall, Adm'r*, 14 N. H. Rep. 161.

The defendant, in the account of Betsy Wilson, executrix, of Peter Wilson, settled by him after her death, has expressly stated and put upon record that she, having a life estate in the property, paid the taxes and incidental expenses. Incidental expenses must, in this case, include the insurance and repairs on the real estate, for there could have been no other. These having been paid by Mrs. Wilson, could not have been paid by the defendant, and can form no part of any legal claim by the defendant against James Wilson. This position disposes of all repairs and charges incident to the real estate to the time of their deaths in July and August, 1846, being the two sums of $239.59 and $28.88, equal to $268.47.

But the defendant claims to have an allowance for these repairs, upon the ground that there was a contract between him and James Wilson, made in September, 1844. I contend that the case does not show any such contract. All that the evidence amounts to is, that there was a conversation about these repairs, and James Wilson expressed himself satisfied. He had no idea of binding himself to pay for the repairs, amounting to a much larger sum than the rent of the premises, for the time the defendant occupied the same. This was a loose conversation; might have been misunderstood by the person who heard it, and may have been misrecollected or misreported. Such a conversation cannot be entitled to much consideration, relating as it does to a matter wherein the defendant, under oath, has caused a record to be made, bearing entirely a different complexion from the one attempted to be sustained by the proof of the conversation reported by the auditor.

If it should be thought, however, that there is evidence from which a contract such as the defendant alleges, may be inferred, I contend that as to the repairs made prior to September, 1844, it was without consideration, and therefore not binding on the defendant's intestate. Mrs. Wilson had a life estate in the real estate, and was bound to keep the same in repair. Woodfall's Land. and Ten. 244; Bisset's Life Est. 301, 334; *Hibbert* v. *Cooke*, 1 Sim. & Stu. Rep. 552; *Partericke* v. *Powlett*, 2 Atk. Rep. 283; 4 Kent's Com. 76.

It being the duty of Mrs. Wilson to keep the premises in repair, any promise on the part of James Wilson to pay for repairs which had been made at the time the promise was made, is clearly without any consideration to support it. It was upon a past consideration, not moving from the promisor; it was a promise to pay for things not done at his request, and for which no liability rested on him; it was clearly a *nudum pactum*, and *ex nudo pacto non oriter actio*. Broom's Leg. Max. 336, and cases there collected; *Colburn* v. *Gould*, 1 N. H. Rep. 280; 1 Fonblanque's Eq. 335, note A.

As to the repairs made after September, 1844. The conversation between James Wilson and the defendant amounted to no more than an authority or power from him to the defendant to make the necessary repairs and take his pay out of the rent. The defendant was the adviser and agent of Mrs. Wilson. He is made so by the will of Peter Wilson, and subsequent transactions show that he acted as such. This, then, was a power or authority from James Wilson to Mrs. Wilson's agent, not his agent; and it could not have been understood that it should last after, or extend beyond the death of Mrs. Wilson, because then James would become possessed of the property in his own right. Prior to that time Mrs. Wilson was entitled to the possession; it was not his until after her death. It was the duty of the defendant to look about him and see his position before incurring the unnecessary expenses of making an addition to the house, and if he proceeded without due caution he should suffer the consequences. The whole conversation, as reported by the

auditor, shows that his authority to the defendant was not to continue after the death of Mrs. Wilson. It is coupled with taking care of her. For these repairs then, amounting to ·$144.72, the defendant's intestate cannot be holden liable.

But it may be contended that James Wilson made the defendant *his* agent, for the purpose of making these repairs. Nothing was said or indicated by either party that shows it was the intention that Edmonds was to occupy the property after the death of Mrs. Wilson. It does not appear that either party contemplated any such thing. If, however, it should be thought that the defendant was made the agent of James Wilson by what took place in September, 1844, it was an authority or power to the defendant not. coupled with any interest, and died with James Wilson. *Gale & al., Ex'rs,* v. *Tappan,* 12 N. H. Rep. 145, and cases there referred to.

An agency is revoked by the death of the principal or agent. Such is, beyond a question, the rule upon this point. Story's Agency 507, and cases there cited; Paley's Agency 185, 186; Russell's Fact. and Brokers 315, 316.

The authority given by James, if any was given, was an authority to get the necessary repairs done. There was no authority to get the property insured, or to pay the aqueduct bill. This last item was occasioned solely for the convenience of the defendant, and should be paid by him.

II. The aqueduct shares.

1. The account of Mrs. Wilson, as executrix of Peter Wilson, settled by the defendant and sworn to by him, shows that Mrs. Wilson accounted for the aqueduct shares; that the defendant never sold them; that the proceeds never came to his hands, and that he never paid the proceeds of the sale of one of those shares to Mrs. Tuckerman, &c., as he alleges. As I have before shown, it is not competent for the defendant to deny or controvert the record, but he is concluded by it.

2. The time when the amount of $225 was paid by the defendant, does not very distinctly appear by the auditor's report; but the item is put down under the last date given in the account,

as stated in the report, to wit: June 30, 1848; and it must be taken, in the absence of any thing more definite, that this amount was paid at that time. The case finds that James Wilson desired, &c., asked, &c. The whole substance and effect of this language, when allowed its fullest scope, can be nothing more or less than that James desired to make a gift of the amount of one of the shares to Mrs. Tuckerman, &c. This gift should have been perfected in the life-time of James, in order to bind his representatives.

The only way to perfect a gift is to give possession of the thing given to the donee; until this is done it is not binding, and does not pass the property. 2 Kent's Com. 438, Ed. of 1832; White's Lead. Cases in Eq. 583, and notes, 609, 615; *Copp* v. *Sawyer*, 6 N. H. Rep. 386.

In this case there was at most a mere desire or direction to give. To bind James Wilson, the gift should have been completed before his death. His death revoked the direction, and his representatives are not bound by the act of the defendant performed after his death. I would refer to the case of *Marston, Appellant*, v. *Marston*, 1 Foster's Rep. 491, and the argument for the appellee in that case upon this point.

III. The excess paid for the support of Mrs. Wilson.

Here again we have the records of the probate court directly in the face of the defendant's claims. By the account of Mrs. Wilson, as executrix of Peter Wilson, settled by the defendant, it appears that she received from his estate, in cash and personal property, $776.42. By the inventory of Mrs. Wilson's estate, rendered by the defendant and sworn to by him, it appears she left personal property amounting to $364.34, of which $192 was cash. The defendant was her executor, and settled an account as such, and by it the expenses of her sickness; and all debts appear to have been paid, and a balance left to pay two legacies given by Mrs. Wilson in her will. If the defendant's claim in this suit is honest and true, the above records are all false. The defendant asks to have all these records disbelieved and set aside, and upon partial evidence to have an amount

allowed him beyond what appears in these records. By refusing to produce his book of accounts, the defendant clearly shows that the records speak the truth. The above simple statement of all the facts upon this point is enough to show the illegality and groundlessness of this claim.

IV. The promissory notes.

This suit is against the defendant as an individual, and not against him in any of his capacities as executor of Mrs. Wilson, or as administrator with the will annexed of 'Peter Wilson. The notes which he claims to have allowed are made payable to the estate ,of Peter Wilson. The claim on the notes, then, is the claim of the estate of Peter Wilson and not of the defendant. Taking the notes in that form by the defendant is an admission by him that the money advanced was the money of the estate of Peter Wilson; therefore he cannot set off these notes against a claim made upon him personally. *Shaw* v. *Gookin*, 7 N. H. Rep. 16; *Colby* v. *Colby*, 2 N. H. Rep. 419; *Woodman* v. *Barker*, 2 N. H. Rep. 479; *Kimball* v. *Bellows*, 13 N. H. Rep. 59; *French* v. *Lovejoy*, 12 N. H. Rep. 458.

The defendant in this case is not entitled to any equitable considerations in his favor. He, as executor of Peter Wilson's will, sold a house in Court street, settled his account as such executor, charged in his account that he had paid to James Wilson $594.50, part of the proceeds of the sale of that house, filed a receipt purporting to be signed by James Wilson, and swore that his account was true. Now he admits that this is all false; that James Wilson never gave him any such receipt; that the money was never paid over, and that the plaintiff has a rightful claim to the same, and the auditor has so found. Under these circumstances I say, upon the points arising in this case, there are no equities in the defendant's favor.

*Hackett*, for the defendant. The verdict in this case is in favor of the defendant, for $396.83. The fact is established that the defendant has paid this amount to and for the plaintiff's intestate. The objection to the payment of this balance is purely

technical. The plaintiff in this case has succeeded to the estate, and is seeking to repudiate the liabilities of his brother. And the question is, whether the law can support or must defeat the manifest equity of the case?

The plaintiff does not complain that he has offered competent evidence which has been ruled out, or that the defendant has offered incompetent evidence, which has been ruled in; but that the facts are not found as he thinks they ought to have been found. He classes his objections under four general heads.

I. The additions and improvements in house No. 8, Court street.

The plaintiff's first point is that the probate records cannot be set aside by parol testimony. I, of course, do not controvert this general position. Whatever was properly included in the accounts settled and passed upon by the probate court, binds the parties to those accounts. But any money which the defendant paid, or any services which he rendered for any of the heirs or legatees of Peter or Betsy Wilson, is not a proper charge against the estate of said Peter or Betsy, and the settlement of the accounts of their estates in no wise affects his right to recover for such money or services. These accounts are *res inter alios;* and if there were items or expenses charged in either of these accounts, tending to show that any part of the defendant's offset was wrong, he is not precluded from introducing proof to explain and support his account in offset.

But the plaintiff goes further, and says that the "defendant, in his account of Betsy Wilson, executrix of Peter Wilson, settled by him after her death, has expressly stated and put upon record that she, having a life estate in the property, paid the taxes and incidental expenses." The plaintiff says this includes repairs, and as it includes repairs, Mrs. Wilson has paid them; and as she paid them, the defendant did not pay for them; and therefore $268.47 of the defendant's claim, embracing more than $200 for finishing the attic, is disposed of.

Our answer to all the objections to this class of claims is—

1st. That the defendant has no where admitted, directly or

impliedly, that Mrs. Wilson paid for the repairs or improvements which he has charged to the plaintiff's intestate, and which the auditor has found due to him.

2d. That the defendant could not in good faith charge any repairs or improvements after September, 1844, either to the estate of Peter or to Betsy Wilson, because it was agreed that the repairs and alterations were to be made and paid out of the rent. James Wilson's object was not to diminish the fund for the support of his grandmother, and to get the improvements and repairs made on the credit of his reversionary interest. The same object induced him, in effect, to borrow for some years between $200 and $300 of Mrs. Tuckerman's and others' capital, in his arrangement about the aqueduct shares. He pledged the income of the house in order to save the house itself.

3d. That the case finds that said improvements and repairs were made by the defendant in pursuance of a contract with the plaintiff's intestate; and that they were reasonable, and were paid for by the defendant.

But the plaintiff further objects—

1. That there was no contract.

2. If there was a contract as to repairs prior to September, 1844, it was without consideration and void.

3. That as Mrs. Wilson, being tenant for life, was bound to keep the premises in repair, if James Wilson promised upon a past consideration, the promise was void, it being a *nudum pactum*.

4. That if James Wilson made the defendant agent to make repairs, it was an agency not coupled with an interest, and died with the principal.

The first objection, that there was no contract, is answered by the report of the auditor.

The answer to the second objection is, that there was a contract between the defendant and the plaintiff's intestate, September, 1844, in pursuance of which the defendant was to go on and complete the improvements and alterations which he had begun, and take his pay out of the rent after the death of Mrs.

Wilson; that this contract was an entirety, and covered the whole ground; that it ratified what had been commenced and what was contemplated; that it is of no importance to inquire whether James Wilson was originally liable for these repairs prior to September, 1844; that by his contract, made at that time, he made himself liable *ab initio;* that the plaintiff's intestate was at no time liable for any of the labor or materials which entered into said improvements; that the defendant had no authority to bind the plaintiff's intestate, and never undertook to do so; and that this contract was in no wise affected by the death of James Wilson.

In regard to the third objection, I deny that Mrs. Wilson's position was that of a tenant for life. The leading object of Peter Wilson was to secure the comfortable support of his infirm wife; and he charged his whole estate with her support. In this posture of circumstances, James Wilson, being about to emigrate west, interfered to promote his own interest. He pledged his contingent interest in the house for the double purpose of saving it for himself, and having it so improved and repaired as to increase its value, and was to pay for it out of the rents, after his grandmother's death. Hence his contract with the defendant in September, 1844. It is of no importance to consider what liabilities Mrs. Wilson was under. Even if she were liable to repair, James Wilson's contract to pay for additions and modifications, and repairs even, of a house in which he had a reversionary interest, was made upon a good consideration, and binds him and his legal representatives. Chitty on Contracts, p. 7; 15 Pick. 159.

The plaintiff further contends that if the defendant was the agent of James, his authority died with the principal. I of course do not deny the general principle that the power of an agent ceases with the death of the principal. But I do deny that the defendant was the agent of James; and I contend, if it were proved that the defendant was James' agent, the proof in this case would have warranted the auditor and jury in finding that the defendant was to make the repairs and improvements,

and take his pay out of the rents of the house improved by the defendant, and that thereby an agency, coupled with an interest, would be established.

But the plaintiff sets up another limitation to the contract. He says that the whole conversation, as reported by the auditor, shows that the authority to the defendant was not to extend after the death of Mrs. Wilson. What then did James Wilson mean when he told the defendant to take his pay out of the rent? Where did James get his authority to direct to whom the rent should go in the life-time of his grandmother? The proof is that the contract was limited only by the subject matters to which it related, and looked to the death of Mrs. Wilson as the time when James was to begin to pay; not when the defendant should stop. The defendant, and not James Wilson, was the agent of Mrs. Wilson. James had no power to rent the house in her life-time, and take her income to improve his own property. I say there is no obscurity about the contract; and if there were, it must be interpreted by taking James to have contracted in subordination to Mrs. Wilson's rights and in accordance with his own.

In reference to the plaintiff's objection to the amount allowed for the aqueduct and insurance, I have only to say that the auditor allowed $180 per annum for the rent of the house, and that this rent was found higher by the amount of the costs of the aqueduct and insurance, because that cost was to be allowed against the rent. The defendant agreed before the auditor that the rent was worth $180, but he and the auditor both understood that the costs of the aqueduct and insurance were to be allowed against it.

II. Aqueduct shares to Mrs. Tuckerman and others.

It will be borne in mind that one share in the aqueduct company was provisionally given to Mrs. Tuckerman and others in Peter Wilson's will; that in September, 1844, preparatory to emigrating west, James Wilson was adopting measures to save the house No. 8, Court street, for himself. In other words, he was planning for his own interest, but in entire subordination to the purposes of his grandfather and the comfort of his grand-

mother. In furtherance of this object, he, in effect, agreed with the defendant, who was the agent of his grandmother and the executor of his grandfather, that if he, in the first instance, would apply the share in the aqueduct, intended for Mrs. Tuckerman and others, to the support of his grandmother, he would afterwards furnish the money to pay the same amount to Mrs. Tuckerman and others; or, in other words, that the defendant might charge that amount to him. This, so far from being a gift, which the intervening death of the donee before it was perfected could annul, was a contract made for his advantage, and which binds him and his legal representatives.

Mrs. Wilson had as good right to sell house No. 8, Court street, as to sell the aqueduct shares. James, aware of his grandmother's unwillingness to defeat her husband's kind purposes in regard to Mrs. Tuckerman and others, chose to make such arrangements as he believed would promote his interest without injuring theirs. In pursuance of this arrangement, and the agreement incident to it, the defendant has paid Mrs. Tuckerman and others $225, and in fulfilment of James' direction to that effect, charged the same to him. Is this an inchoate gift which the legal representatives of James Wilson can repudiate, or is it a contract which binds them?

But the plaintiff says the defendant never sold the aqueduct shares; the proceeds never came into his hands; or, in other words, that the charge of $225 paid to Mrs. Tuckerman and others, is contradicted by the probate records.

We say that the probate records, instead of contradicting, confirm the payment. Mrs. Wilson died without settling her account as executrix of Peter Wilson, and the defendant settled the account September 21, 1847. In this account the estate of Peter Wilson is credited with $212, received from note of Goodwin & Coues, and $1034.50, personal property, taken at the appraisal, viz: Two shares aqueduct, $420; in bank, $400; furniture, $214.50; total, $1246.50.

This account shows that the aqueduct shares were in Mrs. Wilson's hands; and her account was balanced by charges in

accordance with the will, such as were allowed in the probate court. The aqueduct shares were sold by Mrs. Wilson, and the proceeds appropriated toward her support; and a long time afterward, the defendant advanced from his own pocket, as the case finds, the amount for which one aqueduct share was sold, ($225,) as he was directed to do by said James Wilson, and charged the amount to him. Now it is clear that if James Wilson had requested the defendant to advance $225 to Mrs. Tuckerman and others, on his account, and the defendant had complied with the request, said James Wilson would be liable to pay the defendant that amount. But in this particular case, James Wilson, in effect, was the residuary devisee of an estate charged with the support of his grandmother, and he made such a contract as his interest prompted; and the defendant has, upon the faith of that contract, advanced the money, and he has so proved, and there is as little authority in law as there is reason in equity, why James Wilson should not pay it. So far from being an inchoate gift, which was meditated by the generosity of James, and which may be defeated by the lack of generosity in John, it was in effect the borrowing by James of the capital which belonged to Mrs. Tuckerman and others, and paying it long afterward without interest.

III. The sum paid for the support of Mrs. Wilson.

The auditor finds that the defendant paid, as charged, $147.06, for the support and board of James Wilson's grandmother, beyond the amount received from the estate of Peter Wilson, or the estate of his widow, in pursuance of the arrangement made between the said James and the defendant, September, 1844.

Does the plaintiff state any legal ground why he should not pay this amount? He argues that the defendant did not pay this sum because Betsy Wilson left an estate of $364.24, $192 of which was cash.

These facts show that Mrs. Wilson lived quite snugly, for the widow of a man who left an estate of $4000 or $5000, and no children. It was not Mrs. Wilson's estate, but her husband's, which was to support her. She had $500 in cash given her

by her husband. This she had a moral and legal right to keep, expend or bequeath. She gave in legacies only $40—$297.29 of it were expended for her last sickness.

The plaintiff's argument is, that as Mrs. Wilson left an estate of $364.34, the bulk of which was expended in her last sickness and funeral expenses, the defendant could not have expended out of his own pocket $147.06, in pursuance of the agreement with the plaintiff's intestate in September, 1844.

This argument, which was quite as appropriate before the auditor as it is before this court, did not satisfy the auditor that the defendant had not paid that sum, and he allowed it to him upon clear proof.

My answer to the plaintiff's objection is, that the plaintiff's intestate, being in effect residuary devisee of Peter Wilson, the whole of whose estate was charged with his widow's support, made an arrangement with the defendant in September, 1844, for the purpose of carrying out Peter Wilson's will, and saving the house No. 8, Court street, for himself: that the defendant, in pursuance of this arrangement, and upon the credit of James Wilson's reversionary interest, which was to be thus protected, advanced $147.06 for the support of Mrs. Wilson—$225 to repay the money which said James had, in effect, borrowed of Mrs. Tuckerman and others, and also advanced $300 to the said James: that the object and effect of these several advances was to enable the said James Wilson to go into business in the west, and to save the house No. 8, Court street, for himself.

The plaintiff is now seeking to hold this very house, and to avoid paying or allowing the money which saved it for him, and has greatly added to its value.

The probate records do not touch this item. It could not have been entered into the account of the estate of Peter Wilson, because that estate did not pay it. It could not have been introduced into the account of Mrs. Wilson's estate, because she had no property to pay it, and did not pay it.

The defendant has advanced $147.06 to save James Wilson's

house, and the plaintiff claims that it shall not be allowed to him because Betsy Wilson left $364.34, with a debt against it for last sickness and funeral, of $297.29. We do not contradict the record; we only claim that our demand is consistent with the record, and that the auditor has so found.

IV. The fourth and last objection of the plaintiff relates to the $300 advanced by the defendant to his intestate. This objection is purely technical.

The auditor finds that the defendant actually advanced the money. The vouchers, for they were regarded as such by the parties, were taken in the form against which the plaintiff excepts, for obvious reasons, all of which more or less distinctly appear from the auditor's report.

Being in that form, it was supposed that the notes would serve as vouchers in the final settlement with James for his share in the estate, and in the other house which was to be sold, and which was in fact sold three years afterward; or, in the event of Mrs. Wilson's needing the whole estate for her support, would serve as evidence to enforce a reclamation against James. It was money which the defendant, from his own pocket, advanced to James upon the credit of his reversion, and to oblige him; and we proved the advance of the cash by the defendant, independent of the vouchers. In fact we did not put the vouchers into the case as evidence. We proved the advance of the cash by the defendant, and the form of the vouchers was proved, to explain the whole contract and transaction. The form of the voucher does not touch the equitable or legal rights of the parties. The court will look at the substance. It was the defendant's money. He advanced it upon an understanding that he might take a corresponding amount out of James' share in his grandfather's estate. It was not put in the ordinary form of a receipt, simply because the parties contemplated the possibility that James might be compelled to refund it.

The plaintiff says that the defendant in this suit is not sued as executor of Peter Wilson, but in his private capacity. But he cannot deny that $594.50 of his claim against the defendant is

for the money which the defendant, as executor of Peter Wilson, received from a sale of house No. 14, Court street. And it was competent for him to advance a part of said sum in anticipation of the receipt of it, and the commencing the suit against the defendant in his private capacity does not alter the rights or remedies of the parties. In fact the plaintiff does not deny this. He claims that the form of the voucher proves that it was Peter Wilson's money which was paid. The fact was proved and found to be otherwise before the proper tribunal. It was then proved and found to be the defendant's money.

The plaintiff has deemed it proper to speak of the fact that the defendant did not produce his books before the auditor, and also of a receipt indicating the payment of money which he admits to be due. The defendant is abundantly prepared to vindicate both of these matters. I do not perceive the bearing either of them have upon the matter before the court, and will simply say that as the defendant was holden by the plaintiff to prove to the auditor all the charges in set-off, I deemed it entirely unnecessary for him to produce his books, and they were withheld by my advice; and he was abundantly prepared, if I had deemed it necessary, to prove that James Wilson authorized him to sign and file that receipt.

Upon the whole, I claim that the defendant, in pursuance of and in conformity with an agreement made with the plaintiff's intestate, in September, 1844, has expended and advanced to and for James Wilson $1180.91, and that there is a balance due the defendant of $396.83.

EASTMAN, J. According to our apprehension of the matters in controversy in this action, we must, in order properly to understand them, first look to the will of Peter Wilson. This will was made May 12, 1842. To it were added two codicils, the last of which was dated April 4, 1843. Peter died in the following November. By this will and codicils his property would appear to consist chiefly of his homestead No. 14, Court street, Portsmouth; the Appleton house No. 8, Court street;

the Pike house No. 5, Chestnut street; land purchased of Sam-
uel Hale on Christian Shore; two aqueduct shares and some
personal property.

Specific legacies in money were given as follows: To his wife,
Betsy Wilson, $500; to Joseph S. Ayers, and Edmonds, the de-
fendant, $50 each; also $50 apiece to Ayers and Edmonds out
of the Hale property, should that remain unsold at the decease
of Mrs. Wilson and not be needed to pay his debts and hers.

There is then given to his wife the use of the houses Nos. 14
and 8, Court street, and No. 5, Chestnut street, during her nat-
ural life; and in the first codicil the Hale land is directed to be
sold and the avails to be paid over to her, toward her support.
The second codicil makes a provision in regard to the Hale land,
as before stated.

The will also provided that if the income of the real and per-
sonal estate should be insufficient for his wife's comfortable sup-
port, she was at liberty to dispose of any part of the same for
her support.  This provision has an important bearing upon the
merits of the whole case.

After the decease of his wife, one half of the house No. 14,
Court street, was to go to James Wilson, the plaintiff's intestate,
upon his paying out certain legacies.  There was also given to
James Wilson and his children the house No. 8, Court street,
after Edmonds had had one year's rent of one half of the same
next succeeding the decease of Mrs. Wilson, and Ayers one
year's rent of the other half.  James Wilson was likewise resid-
uary legatee of one third of the personal property left after the
payment of debts and legacies.

If the aqueduct shares remained unsold at Mrs. Wilson's de-
cease, one was given to James Wilson and the other to Mrs.
Tuckerman and others.  Mrs. Wilson was appointed executrix of
the will, and in case of her decease, James Wilson, Joseph S.
Ayers and Joseph M. Edmonds.

Mrs. Wilson as executrix had an inventory taken of the estate
of her husband.  The real estate was appraised at $3300.  The
personal property at $1034.50, as follows: Two aqueduct shares,

$420; money on deposit in the Savings Bank, $400, and furniture, $214.50.

Mrs. Wilson died in July, 1846, before settling any account as executrix, and James Wilson died in August following. According to the provisions of Peter's will, Edmonds was appointed executor *de bonis non*—James Wilson, one of the three designated by the will, being dead, and Ayers, the other, declining to act.

Edmonds settled the account of Mrs. Wilson as executrix of her husband's will, and therein credited the estate with the amount of the personal property, appraised $1034.50, and $212, collected on note of Goodwin & Coues, making $1246.50. He then charged as follows:

| | |
|---|---|
| Last sickness and funeral expenses, . . | $207.32 |
| Payments to sundry creditors, . . . . . | 341.26 |
| Paid appraisers and advertising, . . . . . | 9.17 |
| Legacy to J. S. Ayer, . . . . . . . | 50.00 |
| "    " Edmonds, the defendant, . . . . | 50.00 |
| "    " the executrix herself, . . . . | 500.00 |
| And commissions (no other services being charged,) . . . . . . . . . . . . . | 62.33 |
| | $1220.08 |

Leaving a balance of $26.42 due the estate.

It will be borne in mind that after the death of Mrs. Wilson, the house No. 8, Court street, was to be occupied one year by Edmonds and Ayers, and then to become the property of James Wilson and his children. The Chestnut street house was to be Mrs. Tuckerman's, and the house No. 14 was to be divided between James Wilson and others ; James to have one half. Consequently the only property to be appraised of the estate of Peter after the decease of his wife, was the personal property then left, and the house No. 14, Court street. This was done by Edmonds. The house was sold for $1189, deducting expenses, and this, together with the balance of $26.42 found due the estate on the settlement of the account of the executrix, and a pew valued at $50, comprised the whole inventory, being $1265.42.

In settling his account as executor *de bonis non*, Edmonds credited the estate with the amount of the inventory. He first charged it with some small items of expense, amounting to $16.67, and then to the net proceeds of the house No. 14, Court street, paid out according to the will as follows: one fourth to P. Wilson Lindsey, one fourth to Hannah Tuckerman, and one half, being $594.50, to James Wilson. A few dollars in commissions balanced the account. These accounts and returns were sworn to by Edmonds.

This statement brings matters down in the order of time to the commencement of the suit by John O. Wilson, the brother and administrator of James Wilson, against Edmonds. The auditor to whom the case was committed has found due the plaintiff's intestate, James Wilson, for rent of house No. 8, Court street, for one year, commencing July, 1847, $180. Mrs. Wilson, the wife of Peter, was entitled by will to the rents up to the time of her decease, which took place in July, 1846; Edmonds and Ayers were also by the will entitled to one year's rent next after her decease, which would bring it up to July, 1847, the time at which the auditor dates the commencement of the charge of rent against Edmonds. The auditor also finds due the plaintiff the further sum of $594.50, for net proceeds of one half of house No. 14, Court street, which it seems had not been paid by Edmonds. He then adds interest so as to make his whole finding for the plaintiff to be $819.08. To this finding neither the plaintiff nor defendant makes any objection, so that the controversy between them relates solely to the set-off. This set-off may be well classified under four heads, as has been done in the argument. First, the repairs, insurance, and taxes connected with the house No. 8, Court street; second, the aqueduct shares; third, the amount expended for the support, burial, &c., of Mrs. Wilson, widow of Peter; and fourth, the promissory notes running to the estate of Peter. These several matters we will consider in their order.

It appears by the report of the auditor that the amount expended for repairs and improvements on the house No. 8, Court

street, during the year 1843–4, prior to September, 1844, when the conversation took place between James Wilson and Edmonds, was $239.59. From that time to the death of James Wilson, in 1846, the amount expended was $28.88, and from the death of James Wilson to the first day of July, 1848, the time when Edmonds left the house, was $144.72. The expenses of the insurance and premium assessments amounted to $11.25, and the taxes for the year 1848 were $11.34; and that there was also paid $4.00 for aqueduct to June, 1848.

It is contended that the repairs made prior to the death of Mrs. Wilson cannot be allowed, because Edmonds has placed upon the probate records, in settling the account of Betsy Wilson, as executrix of Peter Wilson, a statement that she paid all the taxes and incidental expenses. What these incidental expenses were does not appear. They were not brought into the account of the executrix, and were not passed upon by the probate court. If they had been, the decision would have been final unless an appeal had been taken from the decree of that court. The jurisdiction of a judge of probate is, in general, sole and exclusive; and his decisions, regularly made, of matters within his jurisdiction, are, unless an appeal is interposed, conclusive against all the world. Such is the language of Chief Justice *Richardson*, in *Bryant* v. *Allen*, 6 N. H. Rep. 116. But as to matters connected with the settlement of an estate, and which might be investigated by the court, but are not, the decision can have no binding effect. Such was the nature of the matters referred to in the memorandum placed upon this account. The taxes and incidental expenses might have been brought in, a debtor and credit account rendered, and a decree might have been passed upon it. But such was not the course taken, and the memorandum entered upon the account was a mere statement in regard to the matters, and formed no part of the decree of the court. But even if they did, we could not, from such a general statement, infer that the incidental expenses spoken of embrace the repairs and improvements made by Edmonds, since they would have absorbed a large part of the widow's income.

It is said also that Mrs. Wilson, being tenant for life, was bound to keep the premises in repair, and that these charges could not properly be made on that account. It is true that a tenant for life is required to keep the buildings in which he may have a life estate from going to decay, by using ordinary care ; but he is not required to expend any extraordinary sums. 4 Kent's Com. 76 ; Co. Litt. 53, a, b; 2 Black. Com. 281. It is quite evident from the report of the auditor that the sums expended by Edmonds were of the latter class, and such as a tenant for life would not be bound in law to make. But it will be recollected that Mrs. Wilson had far greater rights in this property than those of a tenant for life, and she was not therefore to be governed by the law in such cases. She had not only the use of the property during life, but the power to sell it, if necessary for her support; and should she find herself compelled to make large expenditures in repairing some of the buildings, she would be obliged to sell other of them to defray the bills. Such were the rights of Mrs. Wilson in regard to this property, and such was her situation respecting it, that we do not see any thing in the probate records that can seriously conflict with the allowance of this claim.

It is further contended, that the promise to pay for the repairs made prior to September, 1844, amounting to $239.59, was without consideration. But we do not so regard it. These repairs and improvements were made upon the house No. 8, Court street, which was to become the property of James Wilson and his children, at the decease of his grandmother, Peter Wilson's widow; and James was directly interested, not only in having the repairs made and the house kept from going to decay, but that they should be paid in such a manner as not to diminish the income of Mrs. Wilson; since, if they did, the property might have to be sold and James thereby lose the house.

Regularly, the auditor, instead of reporting the evidence showing an agreement to pay for these repairs, and referring the matter to the court, should have stated distinctly whether he allowed these items or not ; and had a motion been made to that effect, the report might have been recommitted for such distinct

finding. But that course was not taken, and the report of the auditor was read to the jury as evidence, without objection by either party, and without exception to its competency as such. Whatever, then, is stated in it we may consider in the same manner as though it were before as upon an agreed statement of facts, or upon a case drawn, where the verdict is taken by consent, and where the evidence is detailed at length. *Bartlett* v. *Trefethen*, 14 N. H. Rep. 427. In the latter class of cases the court examine the evidence, and if they find that it is competent to sustain the verdict, judgment is entered accordingly. The counsel upon both sides have treated the case in this manner, and have argued all the several matters returned in the report, as though they had been laid before the jury directly, without the intervention of the auditor's report. And we think the evidence was competent from which to find an original request to make the repairs, and a binding promise to pay. A promise made upon a past and executed consideration is in general not binding. *Hunt* v. *Bate*, Dyer's Rep. 272; *Bartholomew* v. *Jackson*, 20 Johns. Rep. 28; Comyn on Contracts 14. But when the labor performed or the services rendered are beneficial to the promisor, and there is nothing in the evidence negativing a request, a jury may, from the circumstances of the case, infer a request. *Hicks* v. *Burhans*, 10 Johns. Rep. 243; *Oatfield* v. *Waring*, 14 Johns. 198; *Doty* v. *Wilson*, 14 Johns. 378; *James* v. *Bixby*, 11 Mass. Rep. 37; 1 Saund. 264, n. 1; Cro. El. 94. The evidence here was competent from which to find a request. Wilson examined the repairs and improvements that had been made, and expressed his satisfaction with the same, &c. The principal doubt that rests upon the matter arises out of the expression that "he must take his pay out of the rent." But it appears to us that he could not have intended that Edmonds should take his pay out of the three accruing rents, because the old lady was at that time entitled to them and could use them as she pleased, and neither Wilson nor Edmonds had any control over them; and because, also, that a diversion of the rents to those purposes would probably require a sale of other real estate

Wilson *v.* Edmonds.

for her support, as before suggested. In one year after the decease of Mrs. Wilson the house would be his, and the rent of course his, and that rent he could promise to Edmonds for the repairs. Such would seem to be the only reasonable intention; and the exceptions to the allowance of this item of the repairs must be overruled. So also must those to the item of $28.88, the sum accruing after the agreement in September and before the death of James Wilson. Wilson "requested Edmonds to *continue* to make such repairs and improvements as he deemed necessary," and this sum was expended in furtherance of that request.

The plaintiff's next position is, that the amount expended for repairs made after the death of James Wilson, being $144.72, cannot be recovered, because, Edmonds being an agent merely, the authority to make the repairs died with the principal. This position is in effect correct. The general doctrine that a delegated authority ceases to exist on the death of the principal, is well established; and an agreement or contract, to be binding upon an estate, must be such in its inception as to reach beyond the decease of the contracting party, in case of his death. The consideration must be of that nature and the intention of parties such that the death of either can make no difference in its legal effect or operation, or in its continuation until perfected. Such we do not regard the agreement between Edmonds and Wilson to have been. It was an authority to make the repairs during the will or life of Wilson. It could not, we think, have been contemplated by him, that Edmonds should be at liberty to make repairs as he might please after Wilson's decease. While Wilson lived he could see what was transpiring and to what extent Edmonds was proceeding, and this might be one reason for holding him bound to pay for the repairs that were made during his life. Upon the facts stated in the case it was quite as far as the court could go, to hold Wilson liable for the repairs made prior to his decease. This item, then, of $144.72, must be stricken from the amount of the verdict.

The small amount paid for taxes and insurance in 1848, during

the year that Edmonds was accountable to the plaintiff for rent—which the auditor has charged against him as $180—cannot come under the agreement of Wilson with Edmonds. But they are items for which the property was liable and which the administrator would be bound to pay; and as the auditor has found them proper matters of set-off upon the evidence before him, we are not inclined to interfere with his finding in that respect.

The amount paid for aqueduct, being only $4, there was no authority to charge the estate with. It was a matter of personal convenience to the defendant, for which he should pay, and not the estate.

We come now to the second division of the set-off, the aqueduct shares. It is objected that the amount paid to Mrs. Tuckerman and others, six in number, for what one of the aqueduct shares sold, being $225, should not be allowed.

The provision of the will in regard to these shares is as follows: If after Mrs. Wilson's decease, the aqueduct shares remain unsold by her, then I give and bequeath one share unto my grandson, James Wilson, and the other to Hannah Tuckerman and five others, naming them. Whether the shares were actually sold before her decease does not distinctly appear. They were taken by her at the appraisal, in the settlement by Edmonds of her account as executrix of her husband's will. If not taken in that way, the estate would have been found in debt to her, and to make up the deficit other property of the estate would have been ordered to be sold. But the amount of one of the shares was paid out by Edmonds to the individuals named in the will, and charged to Wilson, in pursuance of his directions in 1844; and if he, as residuary legatee, and as interested largely in the remainder of the estate, saw fit to direct that the wishes of his grandfather should be carried into effect when it impaired the amount to be received by him, we discover no reason why his administrator should not be held to make good his directions in this respect.

The next objection to the set-off, is to the allowance of the sum of $147.06, charged by the defendant for the support,

burial, &c., of Mrs. Wilson, beyond the amount received from her estate, or the estate of Peter Wilson. It is contended that this cannot be allowed because it is not proved, but on the contrary, is disproved and contradicted by the probate records. But the auditor, who had the evidence before him and the probate records also, finds that it is proved. The records do not contradict the charge. They have a tendency to disprove it, but there is nothing in them by which the defendant is estopped from setting up the claim, and the evidence produced appears to have satisfied the auditor of its justness.

The only remaining matter in controversy is that of the notes, amounting to $300, which were taken as running to the estate of Peter Wilson. With regard to them, if they could not be used as evidence of a debt, and of money advanced by Edmonds to Wilson, yet in equity they would be a fair subject of set-off against the sum of $594.50, which was a legacy to Wilson arising by the will of Peter and out of his estate. But independent of the notes, even were they not used as evidence, there is sufficient found by the auditor to show that Wilson had $300 of Edmonds, and that it has never been paid.

We place much confidence in the judgment of the intelligent and experienced auditor who sat in this case ; and when we find him saying that the expense of the repairs and improvements on the house No. 8, Court street, was reasonably charged ; that the services charged and the money charged as expended, were performed and expended as charged in the repairs and improvements of that house ; that the money charged as expended for the support and burial of Peter Wilson's widow, beyond the amount received from the estate of Peter Wilson, or the estate of his widow, was paid as charged ; that on the 26th of September, 1844, Edmonds advanced $200 to James Wilson and took his note for that sum, payable to the estate of Peter Wilson, or order, on demand, with interest, and afterward advanced him another sum of $100, and took his note for the same, payable to the estate, on demand, with interest ; and when we discover nothing that stands seriously in the way of the general matters

of his finding, we are the more ready to sustain the verdict of the jury in its principal features.

We might add that many of these items of set-off could probably be obtained by the defendant, on a re-settlement of the several accounts in the probate court, and by a suit upon the notes in behalf of the estate of Peter Wilson ; so that a disallowance of them here would only protract the litigation.

According to the provision made in the transfer of the case, judgment must be entered for the defendant for the balance of his set-off and interest, after deducting the items of $4, and of $144.72.

*Judgment for the defendant.*